# ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
MICHAEL FORMAN, ESQ. (State Bar No. 260224)
mforman@rosensaba.com
2301 Rosecrans Ave, Suite 3180
El Segundo, CA 90245
Telephone:    (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiff,
S.S.L INVESTMENTS, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.S.L INVESTMENTS, LLC, a California limited liability company, | Case No.: |
| *Plaintiff,* | **COMPLAINT FOR DAMAGES** |
| v. | 1. **RICO (18 U.S.C. §1962(c))** |
| ASHA OROSKAR, an individual; ANIL OROSKAR, an individual; PRIYANKA SHARMA, an individual; PULAK SHARMA, an individual; GREGORY ROCKLIN, an individual; OROCHEM TECHNOLOGIES, INC., an Illinois corporation; KAZMIRA, LLC; a Delaware limited liability company; and DOES 1 through 10, inclusive, | 2. **Conspiracy to Violate RICO (18 U.S.C. §1962(d))** 3. **Fraud (Intentional Misrepresentation)** 4. **Fraudulent Concealment** 5. **Unlawful Business Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)** 6. **False Advertising (Cal. Bus. & Prof. Code §§ 17500 *et seq.*)** |
| *Defendants.* | **JURY TRIAL DEMANDED** |



i

**TO THIS HONORABLE COURT AND ALL INTERESTED PARTIES:**

Plaintiff S.S.L INVESTMENTS, LLC ("SSL") alleges the following claims against Defendants ASHA OROSKAR; ANIL OROSKAR; PRIYANKA SHARMA; PULAK SHARMA; GREGORY ROCKLIN; OROCHEM TECHNOLOGIES, INC.; and KAZMIRA, LLC (collectively "Defendants") as follows:

## THE PARTIES

1.      Plaintiff S.S.L INVESTMENTS, LLC is a California limited liability company.  During the relevant time period, SSL's principal place of business was located at 9419 Mason Avenue, Chatsworth, California 91311. SSL's current address is 10700 San Monica Blvd, Suite 203, Los Angeles, CA 90025.  SSL is and was member managed by Michael Yedidsion, Pedram Salimpour, H. Troy Farahmand, and Bob Kashani, each of whom are domiciled in California.

2.      Defendant OROCHEM TECHNOLOGIES, INC. ("Orochem") is a corporation organized under the laws of Illinois with its principal place of business at 340 Shuman Boulevard, Naperville, Illinois 60563.  Orochem represents that it is a "leading provider for specialty purification technologies" and "a global expert in chromatography, including Simulated Moving Bed ("SMB") chromatography."  On information and belief, Orochem is a private company that is wholly owned by Asha Oroskar and Anil Oroskar.

3.      Defendant ASHA OROSKAR is an individual who is domiciled in Naperville, Illinois.  At all relevant times, she was the principal, President, and Chief Executive Officer of Orochem.

4.      Defendant ANIL OROSKAR is an individual who is domiciled in Naperville, Illinois.  At all relevant times, he was the principal and Chief Technology Officer of Orochem.

5.      Plaintiff KAZMIRA, LLC ("Kazmira") is currently a Delaware limited liability company with its principal place of business at 34501 E. Quincy Ave.,



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Building 35, Watkins, Colorado, 80137. In January 2017, Kazmira was formed by Anil Oroskar, Asha Oroskar, and Orochem as a Colorado limited liability company with its principal place of business is located at 34501 E. Quincy Ave., Building 35, Watkins, Colorado 80137. In May 2020, Kazmira registered as a Delaware limited liability company. On information and belief, Kazmira is a private company that is owned by Asha Oroskar and Anil Oroskar, and is a subsidiary, partner, and/or licensee of Orochem. Kazmira uses Orochem's chromatography equipment to make cannabidiol oil that is derived from hemp. Kazmira's co-Chief Executive Officers are Defendants Priyanka Sharma and Pulak Sharma, who are the children of Asha Oroskar and Anil Oroskar. The land on which Kazmira's facility is located is owned by APPoGee Kazmira, LLC, a real estate holding company with the sole purpose of holding title to the property. The only members of APPoGee Kazmira, LLC are Asha Oroskar and Anil Oroskar.

6. Defendant PRIYANKA SHARMA is an individual who is domiciled in Denver, Colorado. Mrs. Sharma is the daughter of Defendants Anil Oroskar and Asha Oroskar, and the wife of Defendant Pulka Sharma. At all relevant times, she was the co-CEO of Kazmira.

7. Defendant PULAK SHARMA is an individual who is domiciled in Denver, Colorado. Mr. Sharma is the son-in law of Defendants Anil Oroskar and Asha Oroskar, and the husband of Defendant Priyanka Sharma. At all relevant times, he was the co-CEO of Kazmira.

8. Defendant GREGORY ROCKLIN is an individual who is domiciled in Atherton, California. At all relevant times, he was the business development agent for Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, Orochem, and Kazmira.

9. The true names and capacities, whether individual, corporate, associate, or otherwise, of the defendants named herein as DOES 1 to 10, are unknown to Plaintiff at this time and therefore said defendants are being sued by such fictitious

names. The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiff. Plaintiff is informed and believes and based thereon allege that each of the defendants designated herein as a DOE was, and is legally responsible in some manner or means for the events and happenings referred to herein and proximately caused damage to Plaintiff, either through their own conduct or the conduct of their agents, servants, or employees, or due to their ownership, supervision, and/or management of the employees, agents, entities, and/or instrumentalities that caused said damages, or in some other manner or means that is presently unknown to Plaintiff. Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the fictitiously sued defendants' true names and capacities, after the same have been ascertained.

10.    At all times mentioned herein, each of the Defendants was the agent, principal, partner, alter-ego, joint venturer, employee, and/or authorized representative of every other Defendant and, in doing the things hereinafter alleged, was acting within the course and scope of such agency, service, and representation and directed, aided and abetted, authorized, and/or ratified each and every act and conduct hereinafter alleged.

11.    Plaintiff is informed and believes, and based thereon alleges, that the business affairs of Orochem, Asha Oroskar and Anil Oroskar are, and at all times relevant were, so mixed and intermingled that they cannot reasonably be segregated, and are in inextricable confusion such that a unity of interest and ownership existed, including the comingling of assets and the use of Asha Oroskar and Anil Oroskar personal telephone, cellular phone, computers, computer software, portable electronic devices, email accounts, bank accounts, and other personal devices and/or accounts in carrying out the actions alleged herein as and/or on behalf of Orochem. Orochem is, and at all times relevant hereto was, used by Defendants Asha Oroskar and Anil Oroskar as a shell and conduit for the conduct of certain of their affairs and is, and was, the alter ego of Defendants Anil Oroskar and Asha Oroskar. The

recognition of the separate existence of Orochem would be unfair and would not promote justice, in that it would permit Asha Oroskar and Anil Oroskar to wrongfully insulate themselves from liability to Plaintiff.  Accordingly, Defendant Orochem constitutes the alter ego of Asha Oroskar and Anil Oroskar, and the fiction of its separate existence should be disregarded.

12.    Plaintiff is informed and believes, and based thereon alleges, that the business affairs of Kazmira, Orochem, Anil Oroskar, Asha Oroskar, Priyanka Sharma, and Pulak Sharma are, and at all times relevant were, so mixed and intermingled that they cannot reasonably be segregated, and are in inextricable confusion such that a unity of interest and ownership existed, including the comingling of assets and the use of Orochem, Anil Oroskar, Asha Oroskar, Priyanka Sharma, Pulak Sharma's personal telephone, cellular phone, computers, computer software, portable electronic devices, email accounts, bank accounts, and other personal devices and/or accounts in carrying out the actions alleged herein as and/or on behalf of Kazmira.  Kazmira is, and at all times relevant hereto was, used by Defendants Orochem, Anil Oroskar, Asha Oroskar, Priyanka Sharma, Pulak Sharma as a shell and conduit for the conduct of certain of their affairs and is, and was, the alter ego of Defendants Orochem, Anil Oroskar, Asha Oroskar, Priyanka Sharma, Pulak Sharma.  The recognition of the separate existence of Kazmira would be unfair and would not promote justice, in that it would permit Orochem, Anil Oroskar, Asha Oroskar, Priyanka Sharma, Pulak Sharma to wrongfully insulate themselves from liability to Plaintiff.  Accordingly, Defendant Kazmira constitutes the alter ego of Orochem, Anil Oroskar, Asha Oroskar, Priyanka Sharma, Pulak Sharma, and the fiction of its separate existence should be disregarded.

## JURISDICTION AND VENUE

13.    The Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1338 in that this action arises under the laws of the United

States, specifically 18 U.S.C. §1962(c) (RICO) and 18 U.S.C. §1962(d) (Conspiracy to violate RICO).  The Court also has supplemental jurisdiction over Plaintiff's state and common law claims pursuant to 28 U.S.C. §1367, which form part of the same case or controversy.

14.    This Court has personal jurisdiction over all Defendants because they conducted business with Plaintiff and committed wrongful acts and/or directed wrongful acts toward and/or that were committed within the County of Los Angeles, California giving rise to this Complaint.  Defendants all traveled to Los Angeles, California to meet with Plaintiff and induce Plaintiff to do business with them.

15.    This Court also has personal jurisdiction over all Defendants pursuant to 18 U.S.C.A. §1965(b) as Plaintiff alleges that Defendants Anil Oroskar, Asha Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin conspired to commit wrongful acts and tortious activities within the County of Los Angeles, California including conspiring to violate RICO under 18 U.S.C. §1962(d)); one or more of the Defendants is subject to personal jurisdiction in this Court; the ends of justice require that other parties residing in any other district be brought before the court; and there is no other district in which a court will have personal jurisdiction over all of the alleged coconspirators.

16.    The exercise of personal jurisdiction over Defendants is reasonable and proper because, at the time pertinent to these allegations, Defendants transacted business and derived substantial revenue from services rendered in the State of California.  Defendants participated in the transactions, negotiations, communications, and other activities within and/or targeted at California that give rise to the claims in this Complaint.  Moreover, Defendants have committed tortious acts causing injury to Plaintiff in California.

17.    Venue is proper in this District because a substantial part of the events or omissions giving rise to this Complaint occurred, and a substantial part of property that is the subject of the action is situated in this District.

## FACTUAL ALLEGATIONS

18.     Tetrahydrocannabinol ("THC") is the psychoactive compound present in cannabis.  Crude THC oil contains impurities such as pesticides, heavy metals, color components, and sugars.  California law requires that THC oil be processed to the point that it only contains trace amounts of impurities. *See e.g.*, Cal. Code Regs. tit. 16, §§ 5714 *et seq*.  The key requirement to producing a marketable supply of THC oil is retaining 90% THC concentration.

19.     Plaintiff was engaged in the processing and wholesale distribution of THC oil for Original Balboa Caregivers, an entity licensed by the State of California to conduct business in the cannabis industry.  Plaintiff managed and operated Original Balboa Caregivers' 100,000 square-foot production facility at 9419 Mason Avenue, Chatsworth, California. Before entering into a business relationship with Defendants, Plaintiff used the processes of flash chromatography and molecular distillation to process the product.

20.     Defendants held themselves out as biotechnology organization that utilized patented column chromatography and SMB chromatography systems to purify and concentrate biopharmaceutical, chemical, and food products.  Defendants represented that they designed, constructed, and installed multiple commercial scale column chromatography and SMB chromatography systems, including in India, Peru, and at Kazmira's facility in Colorado.

21.     Column chromatography is a technique used to separate the components of mixtures, such as crude THC oil. The basic process of column chromatography is as follows:  In the mobile phase, crude THC oil is mixed with a fluid that carries it through a large column, which contains a different material called the "stationary" phase.  The components of the mobile phase travel through the stationary phase at different speeds, causing the components to separate.   Simulated Moving Bed chromatography ("SMB") uses a similar process.  In SMB chromatography, the mobile phase travels in a continuous loop through multiple smaller columns, moving

countercurrent to a constant flow of solid (stationary phase). The countercurrent flow enhances the potential for the separation and makes the process more efficient.

22.     In May 2018, Plaintiff was approached by Gregory Rocklin, the business development agent for Asha Oroskar, Anil Oroskar, Priyanka Sharma, and Pulak Sharma, Orochem, and Kazmira. Mr. Rocklin represented that that Defendants' proprietary technology would upgrade Plaintiff's existing process and provide solvent-free, "full spectrum" THC oil in commercially viable quantities.

23.     On May 7, 2018, Gregory Rocklin sent an email to Plaintiff touting Defendants' Stevia One facility in Peru, "where we recently designed, built and started up a new operation for extraction of Stevia." Mr. Rocklin gave a slide deck to Plaintiff containing photographs of Defendants' facility in Peru and said the pictures showed a fully operational, commercial-scale SMB facility. This was significant because the production process Defendants were pitching to Plaintiff is substantially similar to the way Stevia is produced, where leaves of the stevia plant are processed into crude oil and then purified to remove contaminants.

24.     Each of the Defendants represented they had a fully operational production process for the production of full spectrum cannabidiol oil ("CBD") oil at their facility in Colorado, which is substantially similar to the THC oil purification process Defendants were pitching to Plaintiff. Defendants operated the Colorado facility under the banner of their subsidiary/partner, Kazmira. Asha Oroskar and Anil Oroskar installed their daughter (Priyanka Sharma) and her husband (Pulak Sharma) as chief executives of Kazmira to give the appearance that Kazmira was not controlled by Asha Oroskar and Anil Oroskar. Gregory Rocklin represented to Plaintiff that Kazmira was "currently processing about 150-200kg of THC-free oil and isolate in total per month with revenue reaching about $2 Million per month in December. The business is profitable."

25.     On May 17, 2018, Pulak Sharma traveled to Los Angeles County, California on behalf of Defendants and visited the offices of one of Plaintiff's

COMPLAINT

principals, H. Troy Farahmand. Pulak Sharma boasted about Defendants' technology, Kazmira facility in Colorado, and active accounts. He represented that Defendants could achieve the same results regarding THC oil as were achieved at the Kazmira facility regarding CBD oil, meaning that Defendants represented they could purify commercial quantities of crude THC oil to a minimum of 90% THC concentration with non-detectable levels of pesticides, heavy metals, color, phospholipids, neutral lipids, color components, solvents, or sugars, as required by Cal. Code Regs. tit. 16, §§ 5000, *et seq.* and Cal. Code Regs. tit. 17, §§ 40200 *et seq.* ("California Specifications"). Pulak Sharma was used as a prop by his in-laws, Asha Oroskar, and Anil Oroskar, to sell Plaintiff on the notion that Defendants' technology was fully developed and capable of performing as represented.

26. Gregory Rocklin gave a slide deck to Plaintiff touting Defendants' success with Kazmira. The deck stated: "Orochem's journey to improve the quality and lower the cost of Cannabinoid products began in 2016 with the formation of Kazmira, LLC… Orochem Technologies developed a chromatographic method to produce CBD from Industrial Hemp, which completely removes THC and enables ton-level production of CBD and other high-value products. Orochem has exclusively licensed this technology to Kazmira." The deck also identified Mr. Rocklin as Kazmira's corporate development representative and a member of Kazmira's "management team."

27. On June 13, 2018, Anil Oroskar and Gregory Rocklin traveled to Los Angeles County, California on behalf of Defendants and met with Plaintiff's principals at their Chatsworth facility. Anil Oroskar and Gregory Rocklin toured the facility and touted Defendants' ability to purify commercial quantities of THC oil from cannabis trim, cannabis crude oil, as well as from cannabis oil that was left over from other production processes, as demonstrated by Defendants' success with Kazmira and Stevia One. They represented that Defendants would use their expertise

to install and operate column chromatography and SMB systems, and recommended certain changes to the facility such as upgraded electrical output capability.

28.     In subsequent oral and written communications, Anil Oroskar and Gregory Rocklin continued to assure Plaintiff that the output of Defendants' processes would be finished oil containing THC purity levels of 90% or above, while retaining all other cannabinoids present in the raw material.  They also continued to assure Plaintiff that such results would be achieved with no more than a 5% loss in total mass of the raw material, and that Plaintiff would make a significant profit.  This was significant because loss of any more than 5% of mass during post-production would impair profitability.  For example, on June 18, 2018, Anil Oroskar represented that Defendants "…can work with low quality feedstocks as well. So if the whole plant is cheaper then we should focus on that." On July 20, 2018, Mr. Rocklin represented that Defendants could provide "…not only an increase in margins due to increase in yields and lower cost of manufacturing, but additional revenue streams due to our ability to meet and greatly exceed the California specifications."

29.     In July 2018, Defendants began proof-of-concept work to demonstrate that its chromatography technology could be used to separate impurities from a small sample of contaminated cannabis oil ("small batch test").

30.     On July 17, 2018, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin traveled to Los Angeles County, California on behalf of Defendants and visited Plaintiff's facility.  Priyanka Sharma, Pulak Sharma, and Gregory Rocklin touted Defendants' technology and its effectiveness at the Kazmira facility in Colorado.  Priyanka Sharma and Pulak Sharma talked about their personal experience at the Kazmira facility and represented that Defendants would produce the same results for Plaintiff, including THC purity levels of 90% while retaining all other cannabinoids present in the raw material, losing no more than 5% of the total mass of the raw material.  Priyanka Sharma and Pulak Sharma were used was used as props by Defendants, including their parents Asha Oroskar and Anil Oroskar, to sell

Plaintiff on the notion that Defendants' technology was fully developed and capable of performing as represented by Defendants.

31.    On July 26, 2018, Mr. Salimpour traveled to Illinois on behalf of Plaintiff to meet with Defendants.  Gregory Rocklin also traveled from California to Illinois and attended the meetings.  Mr. Salimpour was given a presentation about Orochem and Kazmira's capabilities, as well as a tour of Orochem's facility in Illinois by Asha Oroskar and Anil Oroskar.  He was also presented with the small batch test results which purported to show that Defendants successfully eliminated pesticides and other contaminants from the oil. Asha Oroskar and Anil Oroskar assured Mr. Salimpour that Defendants could produce the same results on a commercial scale using their column chromatography and SMB chromatography systems. Asha Oroskar spoke to Mr. Salimpour about her vast experience in science and showed him a section of Defendants' facility that could produce gel caps for use in the production of soft get capsules. She represented that the Defendants' existing, "patented water-soluble technology" could be used in Plaintiff's facility to make beverages infused with cannabinoids such as THC and CBD. This was significant because it was highly desirable to add soft get capsules and cannabis infused drinks to a cannabis product line.  However, Defendants never brought their soft-gel manufacturing equipment or "patented water-soluble technology" to Plaintiff's facility.  Defendants just dangled this and other business opportunities in front of Plaintiff as part of their confidence game.

32.    Unbeknownst to Plaintiff, Defendants were misrepresenting their capabilities and track record. The true state of affairs was that Defendants' "proprietary technology" was not fully developed and Defendants' actual intent in associating with Plaintiff was to conduct research and development at Plaintiff's facility and at Plaintiff's expense, and then abandon Plaintiff and use the fully developed technology for their own purposes. When Defendants made their representations to Plaintiff, Defendants knew they could not purify THC oil to the

California Specifications.  They knew that the column chromatography would not function as promised, as it was incapable of refining the oil to 90% purity without significant losses in mass during processing.  Defendants also knew that the SMB unit was not commercial-grade and would never actually be delivered because it could not function as promised.

33.  This is the same scam that Defendants committed on another company, Arjuna Natural Extracts ("Arjuna"), a foreign corporation with is principal place of business in India. In 2015, Defendants represented to Arjuna that their SMB chromatography machines could purify commercial quantities of omega-3 oils to 90% purity. Based on Defendants' representations, Arjuna contracted with Defendants to provide, install, and supervise operation of a commercial grade SMB unit. After Arjuna spent millions of dollars to purchase Defendants' equipment, built a new factory and purchased raw materials, Defendants installed a SMB unit at Arjuna's facility.  However, it failed to purify the oil to Arjuna's specifications. Then, Defendants spent months, and millions of dollars of Arjuna's money in an unsuccessful attempt to fix the process, but all Defendants ended up doing was continuing to test their nonfunctional equipment at Arjuna's facility and at Arjuna's expense.  Ultimately, however, the SMB unit was nonfunctional and unusable for the purposes of purifying omega-3 oil.  Arjuna discovered that Defendants did not deliver the commercial grade SMB unit they promised, but rather had delivered a "pilot" SMB unit with unproven functionality.  Defendants refused to refund any of Arjuna's money.  Arjuna sued Orochem in the United States District Court for the Northern District of Illinois (*Arjuna Natural Extracts v. Orochem Technologies*, N.D.Ill. case no. 20-1644) alleging claims for Fraud and Breach of Contract, and seeking $15 million in damages.  The case settled in October 2020.  Defendants never told Plaintiff about the failed experiment with Arjuna.

34.  On August 3, 2018, Anil Oroskar represented to all of Plaintiff's principals that "we are able to purify using our technology the black crude into a nice

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

looking high purity THC oil *(without pesticides)*.  We can set this system up in your facility in August."

35.    On August 8, 2018, Priyanka Sharma, Asha Oroskar, Anil Oroskar, and Gregory Rocklin traveled to Los Angeles County, California and toured Plaintiff's facility in Chatsworth.  Once again, each of them made representations about the ability of Defendants' technology to process commercial quantities of THC oil to the California Specifications.  Priyanka Sharma talked specifically about her personal knowledge of how well Defendants' processes worked at the Kazmira facility, which gave credence to Defendants' representations that their processes would work just as well for Plaintiff.  Priyanka Sharma was used as a prop by Defendants to "seal the deal."

36.    In the days following the August 8, 2018 meeting, Gregory Rocklin and Anil Oroskar increased the aggressiveness of their representations.  On August 8, 2018, Mr. Rocklin represented to Plaintiff: "We have proven that we can meet the required California Specifications and thereby set precedent in the state, if not the country.  Moreover, we have proven time and time again that we can scale up to any required volumes with appropriate capital, and improve economies at each level."  On August 11, 2018, Mr. Rocklin represented to Plaintiff: "…Orochem can make a substantial impact on yield and quality by implementing our cannabinoid-specific process, and we are willing to structure the deal to guarantee it. As I'm sure you understand, the greater yield will have a direct and immediate impact on your raw material expense, cash flow and profitability." (emphasis in original).  On August 12, 2018, Anil Oroskar represented that Defendants "have the technology to make SSL the largest THC-Oil producer in California...perhaps the world."

37.    In reliance on Defendants' false representations and concealment of material facts, Plaintiff entered into a business venture with Defendants whereby Plaintiff would supply the facilities and raw materials and capital, and Defendants would install and operate their column chromatography and SMB chromatography

machines to create 90% pure THC oil with no impurities in accordance with the California Specifications. Defendants would own all manufacturing-related intellectual property developed during the course of the parties' engagement. Defendants would also receive 20% of the profits from the sale of products produced. Anil Oroskar wrote an email to Plaintiff, Asha Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin congratulating everyone on the business venture.

38.   In November 2018, Defendants installed their equipment in Plaintiff's facility, which would be operated by Defendants' technicians. Significantly, Defendants installed large column chromatography units but did not install SMB chromatography units. Defendants promised that the column chromatography units could produce THC oil that met the required specifications and that the SMB unit could be installed at a later time. However, delivering the SMB at a later time was not part of the deal. Ultimately, Defendants refused to deliver the SMB unless Plaintiff paid extra for it, and the SMB was never delivered.

39.   In reliance on Defendants' representations, Plaintiff spent $3.5 million to build-out its Chatsworth production facility to comply with Defendants' manufacturing requirements. Plaintiff updated the facility to include additional electrical capabilities and ventilation, including building-out nine manufacturing suites that each had its own power supply, ventilation, and security system. Plaintiff also contributed $500,000 worth of unprocessed crude cannabis oil for the first production run ("batch").

40.   Defendants were unable to meet the production specifications on the first batch. Nonetheless, Defendants did not install the SMB. Instead, Defendants tried to fix the problem by placing the output of the first batch through the column chromatography units several additional times, but Defendants were still unable to meet the production specifications and much of the oil's mass was lost in the process.

41.   Defendants repeatedly represented they could meet the agreed-upon specifications. In reliance on these representations, Plaintiff purchased additional,

unprocessed oil for the second, third, and fourth batches between September 2018 and December 2018.  However, Defendants were still unable to meet the production specifications.  Plaintiff also lost the opportunity to process the oil using methods it employed prior to entering into a joint venture with Defendants.

42.   In December 2018, Defendants performed another small batch test and reported to Plaintiff that the sample contained 90% THC, in addition to other cannabinoids, and zero pesticides.  However, once again, Defendants were unable to replicate this result on a larger scale.  Nonetheless, Defendants did not install the SMB.  Defendants continued to attempt to fix the problem by placing the output through the column chromatography units several additional times, but Defendants were still unable to meet the production specifications.  The total mass of the oil ultimately produced by Defendants' processes was significantly lower than promised, which destroyed the profitability of the oil for Plaintiff, and Defendants took longer than promised to produce this insufficient quantity of oil.  Then Plaintiff was forced to sell lower quantities of product at a loss.  Plaintiff lost clients as well as credibility in the California cannabis market due to the delays and inability to provide finished goods in time.

43.   In December 2018, Defendants demanded that Plaintiff contribute towards the purchase of additional equipment to augment Defendants' existing (non-functional) system. Plaintiff agreed to contribute $75,000 towards a commercial grade solvent recovery system while adding additional electrical upgrades to accommodate the new unit.  Plaintiff spent $25,000 on electrical upgrades to the production facility.

44.   On December 27, 2018, at Defendants' request, Plaintiff (in California) wired $75,000 to Orochem (in Illinois).

45.   In January and February 2019, Defendants were unable to meet the production specifications for the fifth and sixth batches. Plaintiff purchased additional, unprocessed raw materials for these batches.  Plaintiff also worked with

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Defendants' technicians and continued to expend money to run trials and generate data that could be used to fix the production process. However, despite giving Defendants ample time and many opportunities to bring the column chromatography units into a conforming, functional state, Defendants failed to ever provide any column chromatography units that functioned as promised.

46.     On March 25, 2019, Anil Oroskar proposed a plan to fix the problems with Defendants' equipment and make Plaintiff "the largest Cannabis facility in the world." However, in order to do so, Plaintiff needed to contribute several million more dollars to get the SMB unit that was supposed to be provided at the outset. Anil Oroskar proposed the installation of a "pilot scale SMB which will produce higher purity oils at about 10kg per day production rate…. We will also install a NF membrane Unit which will allow simplification and scale up of extraction. This unit is being built currently. In order to expand production volumes to 100kg per day we will have to purchase a larger SMB which costs about $3M. See below. If you can allocate this capex we can install this SMB right away. Once we install large scale SMB and NF Membrane Units then the Shoolin-SSL Facility will have world-class THC technology. It will become the largest Cannabis facility in the world."

47.     From approximately mid-2018 through late 2019, Gregory Rocklin traveled to the Chatsworth facility and met with Plaintiff at least once per month. Each time, Mr. Rocklin assured Plaintiff that Defendants' processes would produce the results promised by Defendants, if Plaintiff continued to contribute capital.

48.     On March 27, 2019, Anil Oroskar and Gregory Rocklin traveled to Los Angeles County, California to meet with Plaintiff at the Chatsworth facility and discuss the proposal. In reliance on Anil Oroskar's misrepresentations about Defendants' ability to fix the problems, Plaintiff agreed to contribute more capital towards the purchase of additional equipment to augment Defendants' existing (non-functional) system.

49.     On April 12, 2019, at Defendants' request, Plaintiff (in California) wired $56,000 to Orochem (in Illinois).

50.     In May 2019 and June 2019, Anil Oroskar pitched ideas to increase Plaintiff's profitability by creating cannabis-infused drinks and soft gel capsules, which are the same business opportunities that Asha Oroskar dangled in front of Plaintiff in the past.  Additionally, Gregory Rocklin pitched ideas for expanding the business relationship between Plaintiff and Defendants that would supposedly generate huge profits.  However, once again, Defendants did not follow through.

51.     By July 2019, as a result of Defendants' stalling, evasiveness, and unfulfilled promises, Plaintiff realized for the first time that it had been defrauded. At this point, it was apparent that Defendants misrepresented the capabilities of their "proprietary technology," misrepresented their proficiency in purifying cannabis oil, misrepresented that a commercial SMB unit would never be delivered, and concealed that Defendants' true intent was to conduct research and development at Plaintiff's facility and at Plaintiff's expense, among other things.

52.     By August 2019, Defendants had processed eighteen batches, for which Plaintiff contributed $1,900,000 worth of raw materials.  However, Defendants never met production specifications at the appropriate volume.  Even though Defendants never performed their obligations, Defendants continued to demand payments from Plaintiff.

53.     On August 30, 2019, Defendants notified Plaintiff that they were terminating their business relationship with Plaintiff.

54.     On October 8, 2019, Defendants removed their machines from Plaintiff's facility.

55.     Plaintiff's reputation was damaged, its' personnel quit, and Original Balboa Caregivers ceased operations in October 2019.

56.     On June 17, 2020, Kazmira obtained $50 million in funding from Perrigo Company plc.

COMPLAINT



**FIRST CAUSE OF ACTION**

**Violation of RICO (18 U.S.C. §1962(c))**

**(Plaintiff against Defendants Asha Oroskar, Anil Oroskar,**

**Priyanka Sharma, Pulak Sharma, Gregory Rocklin and DOES 1 to 10)**

57.    Plaintiff refers to and incorporates paragraphs 1 through 56 as though fully set forth herein.

58.    Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin are each a person within the meaning of 18 U.S.C. §§1961(3) and 1962(c).

59.    Beginning in at least May 2018 and continuing through at least October 2019, Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin were associated in fact in and with an enterprise which conducted its affairs through a pattern of racketeering activity, and whose conduct and activities affected interstate and foreign commerce.

60.    The enterprise ("Orochem Kazmira RICO Group") consists of Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin.  Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin agreed to and did conduct the affairs of the Orochem Kazmira RICO Group enterprise through a pattern of racketeering for the unlawful purpose unlawful purpose of deceiving and defrauding Plaintiff and other victim companies into funding their research and development activities, then abandoning the victim companies and using the fully developed technology for their own purposes.

61.    Alternatively, the enterprise is Orochem, and consists of Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin, who agreed to and did conduct the affairs of Orochem through a pattern of racketeering for the unlawful purpose of deceiving and defrauding Plaintiff and other victim companies into funding their research and development activities, then

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

17

COMPLAINT

abandoning the victim companies and using the fully developed technology for their own purposes.

62.     Alternatively, the enterprise is Kazmira, and consists of Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin, who agreed to and did conduct the affairs of Kazmira through a pattern of racketeering for the unlawful purpose of deceiving and defrauding Plaintiff and other victim companies into funding their research and development activities, then abandoning the victim companies and using the fully developed technology for their own purposes.

63.     Pursuant to and in furtherance of their fraudulent scheme, the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira committed multiple related acts which include acts in violation of: (i) 18 U.S.C. § 1343 (wire fraud); and (ii) causing the transportation of persons and money having a value of $5,000 or more in interstate commerce by means of fraud (18 U.S.C. § 2314).

64.     The predicate acts alleged herein occurred after the effective date of 18 U.S.C. §1961, *et. seq*. and the last such act occurred within ten years after commission of a prior act of racketeering activity.   These racketeering activities include repeated acts of:

        a)     Wire Fraud – 18 U.S.C. §1343 - The Orochem Kazmira RICO Group and/or Orochem and/or Kazmira devised, and intended to devise, a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises. For the purpose of executing their schemes to defraud and attempting to do so, the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira did transmit and caused to be transmitted writings for the purpose of executing a scheme to defraud by means of wire communications in interstate commerce.

        b)     Transportation of Funds In Interstate Commerce Obtained By Fraud - 18 U.S.C. §2314 - The Orochem Kazmira RICO Group and/or Orochem

and/or Kazmira solicited and accepted transfers of money in interstate commerce, knowing the same to have been taken by fraud.

c)      Inducing a Person to Travel in Interstate Commerce in Execution of a Fraudulent Scheme - 18 U.S.C. §2314 - The Orochem Kazmira RICO Group and/or Orochem and/or Kazmira induced Plaintiff to engage in interstate travel from California to Illinois in furtherance of a scheme to defraud.

65.     Based on the limited information to date available to Plaintiff at this time, there are hundreds of predicate acts committed by the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira.  Examples include:

66.     Examples of Defendants' Use of Interstate Wire Communications - Each email below constitutes a transmission, writing, sign or signal by means of interstate or foreign commerce sent in furtherance of the scheme to defraud.

| Date | Description | Sender | Recipients |
|------|-------------|--------|------------|
| Aug 3, 2018 | "We are able to purify using our technology **the black crude into a nice looking high purity THC oil (without Pesticides)**. We can set this system up in your facility in August." (emphasis in original). | Anil Oroskar (Illinois) | Pedram Salimpour Michael Yedidsion Troy Farahmand Bob Kashani Gregory Rocklin (California)<br><br>Asha Oroskar Michael Layden (Illinois) |
| Nov 1, 2018 | "Currently, oil we can produce from hemp has 3%+ CBG, 50%+ CBD, and THC-free!" | Priyanka Sharma (Colorado) | Anil Oroskar Asha Oroskar Mike Layden (Illinois)<br><br>Gregory Rocklin (California) |
| Aug 12, 2018 | "We have the technology to make SSL the largest THC-Oil producer in California... perhaps the world. We have good chemistry between | Anil Oroskar (Illinois) | Pedram Salimpour Michael Yedidsion Troy Farahmand Gregory Rocklin |

Rosen ✧ Saba, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ◊ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

| | | | |
|---|---|---|---|
| the stake holders on both sides. We both have enough funds to make this happen.  Orochem has in the pipeline some of best CBD and THC formulations including water soluble and soft gels which we can bring to SSL." | | | (California) |
| Aug 11, 2018 | "Orochem can make a substantial impact on yield and quality by implementing our cannabinoid-specific process, and we are willing to structure the deal to <u>guarantee</u> it.  As I'm sure you understand, the greater yield will have a direct and immediate impact on your raw material expense, cash flow and profitability." (emphasis in original) | Gregory Rocklin (California) | Anil Oroskar Asha Oroskar (Illinois) Pedram Salimpour Michael Yedidsion Troy Farahmand (California) |
| July 31, 2018 | "Our technology can do both: Retain THCA but also can convert it to THC and make remediated oil." | Anil Oroskar (Illinois) | Pedram Salimpour Michael Yedidsion Troy Farahmand Bob Kashani Gregory Rocklin (California) |
| June 24, 2018 | "Greetings from Honolulu….. 1. Orochem has a history of engagement with customers on exclusive relationship e.g. Omega-3 with BASF, Krill PL with Aker, Stevia Glycosides with Stevia One…etc. 2. Orochem has always obtained a strong IP position in whichever molecule it develops and commercializes on large scale. 3. Orochem's SMB technology is fully scaleable and is very difficult to duplicate (very strong barrier to entry). 4. Orochem provides fully vertically integrated work process: R&D, Engineering, Fabrication, Installation, and Comissioning. 5. Orochem provides the highest level | Anil Oroskar (Hawaii) | Priyanka Sharma Pulak Sharma (Colorado) Pedram Salimpour Michael Yedidsion Troy Farahmand Bob Kashani Gregory Rocklin (California) Gautham Oroskar (Illinois) |



| | | | |
|---|---|---|---|
| | of analytical capabilities…" | | |
| June 14, 2018 | "I do believe that there is a lot of synergy of your plans for the facility with Orochem's extraction and purification technology." | Anil Oroskar (Illinois) | Priyanka Sharma Pulak Sharma (Colorado)<br><br>Pedram Salimpour Michael Yedidsion Troy Farahmand Bob Kashani Gregory Rocklin (California) |

67.    Examples of Defendants' Transportation of Funds In Interstate Commerce Obtained By Fraud - Each entry below describes a payment sent by Plaintiff in California to Defendants in Illinois, due to the fraud:

| Date | Recipient | Details | Amount |
|---|---|---|---|
| Dec 27, 2018 | Orochem Technologies, Inc. | Domestic wire transfer from Plaintiff | $75,000 |
| April 12, 2019 | Orochem Technologies, Inc. | Domestic wire transfer from Plaintiff | $56,000 |

68.    Defendants' induced Plaintiff to engage in interstate travel in the execution of a scheme to defraud when they caused Mr. Salimpour to fly to Illinois on behalf of Plaintiff to meet with Defendants in Illinois on July 26, 2018.

69.    Based upon the allegations in *Arjuna Natural Extracts v. Orochem Technologies*, N.D.Ill. case no. 20-1644), the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira also victimized other companies in a manner similar to Plaintiff.    On information and belief, interstate and/or international wire transmissions, as well as interstate and/or international transfers of funds occurred in commission of those frauds.

70.    Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin each had a role in the racketeering enterprise that was distinct from the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira.

ROSEN ◈ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

71.     Plaintiff's business and property were injured as a direct and proximate result of the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira's violations of 18 U.S.C. § 1962(c), including by reason of the predicate acts constituting the pattern of racketeering injury, as alleged with greater particularity in the foregoing paragraphs.

72.     As a result of the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira's violations of 18 U.S.C § 1962(c), Plaintiff suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorney fees incurred by reason of the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira's violations of 18 U.S.C. § 1962(c).

## SECOND CAUSE OF ACTION
### Conspiracy to Violate RICO (18 U.S.C. §1962(d))
### (Plaintiff against Defendants Asha Oroskar, Anil Oroskar,
### Priyanka Sharma, Pulak Sharma, Gregory Rocklin, and DOES 1 to 10)

73.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 72 and incorporate them herein by reference.

74.     Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. §1962(c) as described above, in violation of 18 U.S.C. §1962(d).

75.     By and through each of their close business relationships, and their close coordination with one another in the affairs of Orochem Kazmira RICO Group and/or Orochem and/or Kazmira, Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin knew the nature of the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira and knew that the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira extended beyond their

individual roles. Moreover, through the same connections and coordination, Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin knew that they were engaged in a conspiracy to commit predicate acts, including those set forth herein, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

76. Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin agreed to facilitate, conduct, and participate in the conduct, management, or operation of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(d). The participation and agreement of each of them was necessary to allow the commission of this pattern of activity.

77. Plaintiff has been injured in its business and property by reason of the Defendants Asha Oroskar, Anil Oroskar, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin's violations of 18 U.S.C. §1962(d), in an amount to be determined at trial. The injuries to Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations include, but are not limited to, lost profits, harm to reputation, competitive harm, attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting these RICO defendants' activities.

78. Pursuant to 18 U.S.C. §1964(c), Plaintiff is entitled to recover treble damages, plus costs and attorneys' fees.

## THIRD CAUSE OF ACTION

### Fraud – Intentional Misrepresentation

### (Plaintiff against all Defendants and DOES 1 to 10)

79. Plaintiff refers to and incorporates paragraphs 1 through 56 as though fully set forth herein.

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



80.    On May 17, 2018, Pulak Sharma traveled to Los Angeles County, California on behalf of Defendants and visited the offices of one of Plaintiff's principals, H. Troy Farahmand, on behalf of Defendants.  Pulak Sharma boasted about Defendants' technology, Kazmira facility in Colorado, and active accounts. He represented that Defendants could achieve the same results regarding THC oil as were achieved at the Kazmira facility regarding CBD oil, meaning that Defendants represented could purify commercial quantities of crude THC oil to a minimum of 90% THC concentration with non-detectable levels of pesticides, heavy metals, color, phospholipids, neutral lipids, color components, and sugars, as required by Cal. Code Regs. tit. 16, §§ 5000, *et seq*. and Cal. Code Regs. tit. 17, §§ 40200 *et seq*. ("California Specifications").

81.    On June 13, 2018, Anil Oroskar and Gregory Rocklin traveled to Los Angeles County, California on behalf of Defendants and met with Plaintiff's principals at their Chatsworth facility.  Anil Oroskar and Gregory Rocklin toured the facility and touted Defendants' ability to purify commercial quantities of THC oil from cannabis trim, cannabis crude oil, as well as from cannabis oil that was left over from other production processes, as demonstrated by Defendants' success with Kazmira and Stevia One.  They represented that Defendants would use their expertise to install and operate column chromatography and SMB systems, and recommended certain changes to the facility such as upgraded electrical output capability.

82.    In subsequent oral and written communications, Anil Oroskar and Gregory Rocklin continued to assure Plaintiff that the output of their processes would be finished oil containing THC purity levels of 90% or above, while retaining all other cannabinoids present in the raw material.  They also represented such results would be achieved with no more than a 5% loss in total mass of the raw material, and that Plaintiff would make a significant profit.  This was significant because loss of any more than 5% of mass during post-production would impair profitability.  For example, on June 18, 2018, Anil Oroskar represented that Defendants "…can work

with low quality feedstocks as well. So if the whole plant is cheaper then we should focus on that." On July 20, 2018, Mr. Rocklin represented that Defendants could provide "…not only an increase in margins due to increase in yields and lower cost of manufacturing, but additional revenue streams due to our ability to meet and greatly exceed the California specifications."

83.   On July 17, 2018, Priyanka Sharma, Pulak Sharma, and Gregory Rocklin traveled to Los Angeles County, California on behalf of Defendants and visited Plaintiff's facility.  Priyanka Sharma, Pulak Sharma, and Gregory Rocklin boasted about Defendants' technology and its effectiveness at Kazmira facility in Colorado.  Priyanka Sharma and Pulak Sharma talked about their personal experience at the Kazmira facility and represented that Defendants would produce the same results for Plaintiff, including THC purity levels of 90% while retaining all other cannabinoids present in the raw material, losing no more than 5% of the total mass of the raw material.

84.   On July 26, 2018, Mr. Salimpour traveled to Illinois on behalf of Plaintiff to meet with Defendants.  Gregory Rocklin also traveled from California to Illinois and attended the meetings.  Mr. Salimpour was given a presentation about Orochem and Kazmira's capabilities, as well as a tour of Orochem's facility in Illinois by Asha Oroskar and Anil Oroskar.  He was also presented with the small batch test results which purported to show that Defendants successfully eliminated pesticides and other contaminants from the oil. Asha Oroskar and Anil Oroskar assured Mr. Salimpour that Defendants could produce the same results on a commercial scale using their column chromatography and SMB chromatography systems. Asha Oroskar spoke to Mr. Salimpour about her vast experience in science and showed him a section of Defendants' facility that could produce gel caps for use in the production of soft get capsules. She represented that the Defendants' existing, "patented water-soluble technology" could be used in Plaintiff's facility to make beverages infused with cannabinoids such as THC and CBD. This was significant

because it was highly desirable to add soft get capsules and cannabis infused drinks to a cannabis product line. However, Defendants never brought their soft-gel manufacturing equipment or "patented water-soluble technology" to Plaintiff's facility. Defendants just dangled this and other business opportunities in front of Plaintiff as part of their confidence game.

85. On August 3, 2018, Anil Oroskar represented to all of Plaintiff's principals that "we are able to purify using our technology the black crude into a nice looking high purity THC oil *(without pesticides)*. We can set this system up in your facility in August."

86. On August 8, 2018, Priyanka Sharma, Asha Oroskar, Anil Oroskar, and Gregory Rocklin traveled to Los Angeles County, California and toured Plaintiff's facility in Chatsworth. Once again, each of them made representations about the ability of Defendants' technology to process commercial quantities of THC oil to the California Specifications. Priyanka Sharma talked specifically about her personal knowledge of how well Defendants' processes worked at the Kazmira facility, which gave credence to Defendants' representations that their processes would work just as well for Plaintiff. Priyanka Sharma was used as a prop by Defendants to "seal the deal."

87. In the days following the August 8, 2018 meeting, Gregory Rocklin and Anil Oroskar increased the aggressiveness of their representations. On August 8, 2018, Mr. Rocklin represented to Plaintiff: "We have proven that we can meet the required California Specifications and thereby set precedent in the state, if not the country. Moreover, we have proven time and time again that we can scale up to any required volumes with appropriate capital, and improve economies at each level." On August 11, 2018, Mr. Rocklin represented to Plaintiff: "…Orochem can make a substantial impact on yield and quality by implementing our cannabinoid-specific process, and we are willing to structure the deal to <u>guarantee</u> it. As I'm sure you understand, the greater yield will have a direct and immediate impact on your raw

material expense, cash flow and profitability." (emphasis in original).  On August 12, 2018, Anil Oroskar represented that Defendants "have the technology to make SSL the largest THC-Oil producer in California...perhaps the world."

88.     When Defendants made these false representations to Plaintiff, they knew the representations were false or make the representations recklessly and without regard for the truth.  Defendants knew that their "proprietary technology" was not fully developed, knew they could not purify THC oil to the California Specifications, knew that the column chromatography would not function as promised, as it was incapable of refining the oil to 90% purity without significant losses in mass during processing, and knew that the SMB unit was not commercial-grade and would never actually be delivered because it could not function as promised.

89.     Defendants intended that Plaintiff would rely on their representations. Defendants' actual intent in associating with Plaintiff was to conduct research and development at Plaintiff's facility and at Plaintiff's expense, then abandoning Plaintiff and use the fully developed technology for their own purposes.

90.     In reliance on Defendants' misrepresentations, Plaintiff conducted business with Defendants, built-out its Chatsworth production facility to comply with Defendants' manufacturing requirements, and purchased unprocessed crude cannabis oil for production batches.  If Plaintiff had known the truth of Defendants' secret intention not to perform as promised, it would have done business with Defendants. Plaintiff was ignorant of the falsity of Defendants' representations, and could not have in the exercise of reasonable diligence discovered the falsity of Defendants' representations.

91.     On August 30, 2019, Defendants notified Plaintiff that it was terminating their business relationship.  Defendants never purified the agreed-upon quantities of THC oil to the specifications required by California law, never replaced the nonfunctioning column chromatography units, and never delivered the SMB unit.

92.     As a direct and proximate result of Defendants' misrepresentations and Plaintiff's reasonable reliance thereon, Plaintiff was damaged in an amount according to proof at trial.  Plaintiff stopped performing operating its profitable business, built-out its Chatsworth production facility to comply with Defendants' manufacturing requirements, and purchased unprocessed crude cannabis oil for production batches. Plaintiff was unable to make the profits that Defendants forecasted and spent resources developing beverage and soft gel product lines that never materialized.

93.     Defendants'   misrepresentations   were   fraudulent,   malicious, unconscionable and oppressive, and were undertaken with conscious disregard for Plaintiff's well-being.  Therefore, these actions entitle Plaintiff to an award of an exemplary and punitive damages in an amount appropriate to punish or make an example of Defendants according to proof.

### FOURTH CAUSE OF ACTION

### Fraudulent Concealment

### (Plaintiff against all Defendants and DOES 1 to 10)

94.     Plaintiff refers to and incorporates paragraphs 1 through 56 as though fully set forth herein.

95.     Defendants concealed from Plaintiff that their "proprietary technology" was not fully developed, they could not purify THC oil to the specifications required by California law, that the column chromatography would not function as promised, and that the SMB unit was not commercial-grade and would never actually be delivered.  Defendants concealed material facts with the intent to induce Plaintiff to do business with Defendants, build-out its Chatsworth production facility to comply with Defendants' manufacturing requirements, and purchase unprocessed crude cannabis oil for production batches.

96.     Plaintiff was ignorant of the facts concealed by Defendants and could not have in the exercise of reasonable diligence discovered the Defendants'

concealment.  If Plaintiff had known the facts concealed by Defendants, it would have done business with Defendants.

97.    As a result of Defendants' concealment, Plaintiff also stopped performing operating its profitable business, built-out its Chatsworth production facility to comply with Defendants' manufacturing requirements, and purchased unprocessed crude cannabis oil for production batches.  Plaintiff was unable to make the profits that Defendants forecasted and spent resources developing beverage and soft gel product lines that never materialized.  Defendants' concealment was a significant factor in the harm suffered by Plaintiff.

98.    Defendants' conduct was fraudulent, malicious, unconscionable and oppressive, and were undertaken with conscious disregard for Plaintiff's well-being. Therefore, these actions entitle Plaintiff to an award of an exemplary and punitive damages in an amount appropriate to punish or make an example of Defendants according to proof.

## FIFTH CAUSE OF ACTION
### Unlawful Business Practices – Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (Against all Defendants and Does 1 through 10)

99.    Plaintiff refers to and incorporates paragraphs 1 through 56 as though fully set forth herein.

100.   Virtually any law or regulation - federal or state, statutory or common law - can serve as predicate for a § 17200 "unlawful" violation.  Thus, if a "business practice" violates any law, it also violates § 17200 and may be redressed under that section. *See e.g., People v. E.W.A.P., Inc.*, 106 Cal.App.3d 315, 319 (1980).

101.   Defendants' business acts and practices were unlawful as described above under California Business and Professions Code §§ 17200 *et seq.*



102.   Defendants' business acts and practices were fraudulent in that a reasonable person would likely be deceived by their material misrepresentations and omissions.

103.   Defendants' business acts and practices were unfair in that the substantial harm suffered by Plaintiff outweighs any justification that they may have had for engaging in those acts and practices.

104.   Defendants have engaged in fraudulent and unlawful practices which have caused Plaintiff to suffer actual injury in fact and lose money or property. Defendants have acquired money or property or other benefits in amounts to be proven at trial as a direct and proximate result of their unlawful business practices directed at Plaintiff.

105.   Plaintiff is entitled to recover restitution, including without limitation all benefits that Defendants received as a result their fraudulent business acts and practices; and to injunctive relief restraining Defendants from engaging in further acts of unfair competition.

## SIXTH CAUSE OF ACTION

### False Advertising – Cal. Bus. & Prof. Code §§ 17500, *et seq*.

### (Against all Defendants and Does 1 through 10)

106.   Plaintiff refers to and incorporates paragraphs 1 through 56 as though fully set forth herein.

107.   Defendants' actions described above constitutes false advertising in violation of the laws of the State of California.

108.   Defendants knew or should have known that their advertising statements were untrue and misleading.

109.   Defendants' untrue or misleading statements were made for the purpose of disposing of goods, performing services, and/or inducing obligations.



110.   As a result of the Defendants' false and misleading advertising, potential and actual consumers have been, and will continue to be, misled about the legitimacy of Defendants' goods, services, or the combination of both being wrongfully marketed, advertised, and sold.

111.   By these actions, Defendants have engaged in false advertising and unfair competition in violation of California Business & Professions Code §§ 17500 *et seq.,* and as a result, Plaintiff has suffered and will continue to suffer damage to its business, reputation, and good will.   Additionally, Defendants have been, and will continue to be, unjustly enriched in profits, income and ill-gotten gains at the expense of Plaintiff and other victims.

112.   As a direct and proximate result Defendants' conduct, Plaintiff has been damaged in an amount to be determined at trial.

## **DEMAND FOR JURY TRIAL**

113.   Plaintiff demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1.   Judgment in Plaintiff's favor and against Defendants, jointly and severally, on all causes of action alleged herein;

2.   Treble damages its general and special compensatory damages to Plaintiff's business and property, damages in an amount to be proven further at trial, plus interest, costs and attorney fees incurred by reason of the Orochem Kazmira RICO Group and/or Orochem and/or Kazmira's violations of 18 U.S.C. §§ 1962 (c) and (d).

3.   For general damages and punitive damages under the California fraud claims

4.   For punitive damages;

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



5.      Restitution;

6.      For costs of suit incurred herein;

7.      For pre- and post-judgment interest;

8.      For attorneys' fees and costs; and

9.      For such other and further relief as the Court may deem to be just and proper.

DATED:  May 3, 2022

ROSEN ◆ SABA, LLP

By: _____

RYAN D. SABA, Esq.
MICHAEL FORMAN, Esq.
Attorneys for Plaintiff,
S.S.L INVESTMENTS, LLC

